# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

LORI E. LONG,                              :        No. 3:06cv578
             **Plaintiff**           :

                                 :        **(Judge Munley)**
                                 :

           **v.**                            :

                                 :

MICHAEL J. ASTRUE, Commissioner :
of Social Security,                        :
             **Defendant**          :

## MEMORANDUM

      Before the court are plaintiff's objections (Doc. 12) to Magistrate Judge Thomas M. Blewitt's report and recommendation (Doc. 10) proposing the we deny her appeal of defendant's decision not to award her social security disability benefits.

**Background**

    **i. Hearings**

      This case began when the plaintiff filed an application for disability insurance benefits and supplemental security income with the Social Security Administration on February 17, 2004.  (Record (hereinafter "R") at 142-144, 328-330).  Plaintiff alleged that she had been unable to work since December 10, 1993, as a result of lupus, chronic fatigue syndrome, herniated discs, muscle/joint pain, carpal tunnel syndrome, and chronic sinus infections.  (Id. at 117, 131).  After the Commissioner denied plaintiff's initial claim, she requested a hearing before an administrative law judge (ALJ).  Accompanied by an attorney, plaintiff testified before ALJ Ellen

Ritteman and a vocational expert (VE) on July 14, 2005 in East Stroudsburg, Pennsylvania.  (Id. at 51-79).  The ALJ held a second, supplemental hearing on December 1, 2005.  (Id. at 24-50).  At this hearing, plaintiff, VE Nadine Henzes and Dr. Lee Besen, a medical expert, testified.  (Id.).  On December 20, 2005, the ALJ issued an opinion denying plaintiff Supplemental Security Income (SSI).  (Id. at 9-19).  Plaintiff requested review of this decision by the Social Security Appeals Council.  (Id. at 7-8).  The Council denied her appeal, and plaintiff brought suit in this court.  (Id. at 4-6).

Plaintiff was forty-one years when the ALJ interviewed her in July 2005.  (Id. at 55).  This age made her a "younger individual" under the Social Security regulations. See 20 C.F.R. § 416.963(c).  Plaintiff graduated high school and had some college education, but left to pursue training in cosmetology.  (R. at 55-56).  She had worked in that field.  (Id. at 56).  Though plaintiff applied for disability benefits in February 2004, she alleged that she had been unable to work since 1994.  (Id.).

Plaintiff testified that she had been unable to work because of lower back problems and "severe pain" on her left side.  (Id.).  She lacked mobility and had difficulty with moving or picking up items.  (Id.).  Plaintiff also faced constant pain in her bones, joints and muscles.  (Id.).  This pain caused her to take anti-inflammatory medication.  (Id.).  In addition to facing irritable bowel syndrome (IBS), plaintiff suffered from severe sinus infections that regularly caused nosebleeds, ear infections and an inability to hear.  (Id.).  She also complained of a growth in her

2

throat.  (Id.).

Plaintiff described her pain in detail to the ALJ.  The pain she suffered in her lower back amounted to "a constant throbbing."  (Id. at 58).  The pain made her legs tingle, especially on the right side.  (Id.).  She felt pain in the area around her buttocks and waist, both front and back.  (Id.).  The pain shot down the front of her legs, and she could feel "throbbing" and "a constant grinding"  (Id.).  Long periods of standing or sitting made her pain "even worse."  (Id. at 59).  She felt pain down her legs, and also in her knees and ankles.  (Id.).

Plaintiff complained of other ailments.  She suffered from carpal tunnel syndrome in both arms, which caused pain in her elbows, wrists and shoulders.  (Id. at 60).  Her doctors, she claimed, had diagnosed her with lupus about eighteen months before the hearing.  (Id.).  Plaintiff testified that these injuries made moving her joints more difficult; she had trouble slicing food in the kitchen and putting on her undergarments.  (Id. at 61).  Medication did little to ease plaintiff's pain.  (Id. at 62).  Plaintiff's stomach problems exacerbated this condition.  She had been diagnosed with irritable bowel syndrome, which frequently caused her to suffer from diarrhea.  (Id.).  Medication helped this condition somewhat.  (Id. at 63).   Plaintiff also complained of frequent sinus infections, which she felt were caused partly by dust mites in her home.  (Id. at 64).  Medication rarely relieved this condition, and plaintiff was often forced to vacuum her home to remove the dust.  (Id.).  These various conditions, plaintiff testified, also led to headaches that were severe enough to seem

3

to her to be migraines.  (Id. at 65).  The worst of those headaches made her feel as if she would vomit and created a "constant pounding, pounding, pounding."  (Id.).

Plaintiff testified about the activities she engaged in at home.  She lived with her spouse and children.  (Id. at 66).  During the day, plaintiff watched her younger children, who were two, five and seven years old.  (Id.)  She reported problems completing her housework.  (Id.).  When her conditions acted up, she faced difficulties "vacuuming, scrubbing the floors" and even preparing dinner.  (Id.).  The situation had improved somewhat, however, because her youngest child no longer needed to be picked up and held as often.  (Id.).  Plaintiff also had trouble caring for her three dogs.  (Id.).  She could not take them for walks, and she could not bend over to take the smallest one, a maltese who weighed ten pounds, out of his cage.  (Id. at 67).  In terms of housework, plaintiff dusted and vacuumed, but relied on her older children to clean the kitchen floor and her husband and sons to handle the outdoor maintenance.  (Id. at 68).  Plaintiff did the laundry, but her sons helped her with tasks that required bending and lifting.  (Id. at 69).  Though she could make the bed, an asthmatic condition slowed her down and made the job difficult.  (Id.).  She did most of the cooking and the grocery shopping, but relied on an older son to push the cart and carry groceries.  (Id. at 68).  Plaintiff sometimes had trouble pushing the grocery cart, but also found it useful as a support in her walking.  (Id.).

Plaintiff's physical condition limited this activity.  (Id. at 70).  She testified that "I do whatever my body requires me to do."  (Id.).  No "particular schedule" of activity

4

existed for her; she alternated between standing and sitting as her physical condition required.  (Id.).  If plaintiff began to feel pain, she would move around.  (Id. at 70-71). If she did not find relief in a particular position and began to feel "achy," she would again shift position.  (Id. at 71).  Plaintiff found that she could not lie flat on her back, but needed to be propped up on a pillow to avoid problems with her sinuses and pain in her hip and back.  (Id.).   When sitting in a chair, plaintiff found she had to get up and move around every fifteen minutes or so.  (Id.).  She also doubted that she could walk two blocks more than once at a regular rate of speed.  (Id. at 72).  Plaintiff also testified that she could not lift heavy items or perform a job that required her to be on her feet most of the day.  (Id. at 73).  Her sinus condition, bowel problems and headaches would also prevent her from performing a more sedentary job. (Id. at 74).

After taking testimony from the plaintiff, the ALJ interviewed George Starosta, a vocational expert.  Starosta found that platiff's testimony, if supported by the medical record, would indicate that no jobs existed in the northeastern Pennsylvania area which plaintiff could perform on a regular basis.  (Id. at 78).  Starosta found that plaintiff "would not be able to attend the required amount of time to do an eight-hour workday." (Id.).  Because plaintiff would probably have to miss two and one-half days per week, no employer would hire her.  (Id.).  Plaintiff would also have to use the bathroom too frequently to suit her employer.  (Id.).  Despite this testimony, the ALJ found that the medical evidence would insufficient to make a determination. (Id. at 79).  She postponed the hearing until the plaintiff could produce MRI records

5

to assist her determination.  (Id.).

On December 1, 2005, ALJ Ritteman held another hearing on the plaintiff's claims.  (Id. at 25-50).  The ALJ had collected more evidence, and introduced it into the record.  (Id. at 26).  During her testimony, the plaintiff reported that her condition had worsened in the months since her previous hearing.  (Id. at 28).  Her irritable bowel syndrome became worse during her menstrual period.  (Id.).  Her gastroenterologist had increased her prescription for Lotranex to combat these problems.  (Id.).

Dr. Lee Besen served as expert during this testimony, questioning the plaintiff. (Id. at 29).  He told the plaintiff that he had examined the results of her MRI exams, and found that "from my viewpoint [they] were not terribly impressive as to . . . any pathology, any major pathology."  (Id.).  The most recent results, collected in January 2005, demonstrated that bulging disks existed.  (Id.).  This result was not significant to Dr. Besen, however, since probably 50% of Americans "would, indeed, have a bulging disk without question."  (Id.).  He asked plaintiff about the muscle and joint pain she experienced.  (Id.).  Plaintiff responded that she felt pain in her shoulders, elbows, wrists, hips, knees and ankles.  (Id.).  She had experienced in the past two months a pain between her shoulder blades and back that made breathing extremely difficult and lifting and moving hard.  (Id. at 29-30).  She had trouble leaning backwards and forwards.  (Id. at 30).

Dr. Besen noted to plaintiff that her doctor had recently reported that the lupus

6

with which she had previously been diagnosed did not appear in her most recent laboratory reports.  (Id.).  He asked her if she was "frustrated" by the fact that "you have lots of aches and pains, [and] they don't, you don't seem to have any diagnosis at this point."  (Id.).  Plaintiff claimed that she did not feel frustrated, but "I just kind of wonder why the blood work showed that I did and then now it says that I don't."  (Id.).  She also reported to the doctor that she had been diagnosed with carpal tunnel syndrome, but had not been recommended for surgery to correct the condition.  (Id. at 31).  Plaintiff listed her medications for the doctor: "Zyrtec D for my sinuses with Afrin and Flonase.  I have Advair for my lungs, for my breathing, I have Lotranex and Nexium–well, the Nexium is for my stomach, the Lotranex for my colon."  (Id.).  She also took Tylenol and Mobic for body aches and inflammation.  (Id. at 32).  Plaintiff reiterated that her aches and pains made movement difficult; when she reached to flush the toilet her back caused her "to be in a, like a paralyzed state."  (Id.).

Dr. Besen also answered the ALJ's questions.  He reported that he had never treated or examined the plaintiff, but that he had reviewed the medical records in the case, focusing on the data since 2003.  (Id. at 33).  Dr. Besen found the medical evidence from Dr. Ludivico, plaintiff's rheumatologist, to be the most creidble.  (Id. at 34).  Plaintiff's symptoms more mostly rheumatologic.  (Id.).  Her irritable bowel syndrome, Dr. Besen found, was not "debilitating."  (Id.).  Her asthma was well controlled, and her allergies did not debilitate her.  (Id.).  He diagnosed a possible herniated disk in plaintiff's back, which was probably "causing the crux of the

symptoms." (Id.).  Though plaintiff complained of a great deal of aches and pains in

her joints, medical examinations did not reveal more than a limited loss of range of

motion.  (Id.).  Doctors had found no swelling in her elbows, wrists or fingers.  (Id.).

In short, "we have a patient that has descriptive symptoms with not many objective

findings." (Id.).  He therefore concluded that plaintiff did not meet or equal a listing.

(Id.).  Plaintiff did have limitations, however, at least based on her own description of

her conditions.  (Id. at 35).  The doctor assured the judge, however, that no evidence

existed that plaintiff was exaggerating her symptoms.  (Id.).  He indicated that by

plaintiff's report of her symptoms, she probably had some limitations in engaging in

daily activity.  (Id. at 37).  Dr. Besen did not describe these limitations, however.  (Id.

at 37).

     After Dr. Besen completed his testimony, the ALJ suggested that the parties

take some vocational testimony in light of his findings.  (Id. at 42).  At the same time,

she suggested to plaintiff's attorney that he could "have Dr. Ludivico [plaintiff's

physician] available to you as a treating source."  (Id.).  Dr. Ludivico could provide

plaintiff with "more specifics as to what he sees and what he–over the year, the time

period she's seen her."  (Id.).  The ALJ also offered to contact this physician with

questions that she and the plaintiff's attorney worked out together.  (Id. at 43).  She

reminded the plaintiff's attorney that "I have to rely on the medical expert I have, you

know, in the absence of the treating physician telling me something" different from

Dr. Besen's assessment.  (Id.).  To the ALJ, the record appeared "troublesome."

(Id.).  Even though Dr. Ludivico had treated the plaintiff, he had not seen her very many times, and the record did not contain "anything specific from him coming up with what he thinks."  (Id. at 43).

After this discussion, the ALJ took vocational testimony from Nadine Henzes, a vocational expert.  (Id. at 44).  The ALJ noted that plaintiff had not engaged in any relevant work in the previous ten years.  (Id. at 45).  The ALJ then described a hypothetical worker to the vocational expert who complained of "joint pain, shoulder pain, hip pain," and pain throughout a large portion of her body.  (Id.).  Though the hypothetical worker had a diagnosis of carpal tunnel syndrome, she had not undergone surgery for the problem.  (Id.).  The worker also had an "indication of decreased range of motion in the back and neck."  (Id.).  She sometimes became very uncomfortable while bending.  (Id.).  This worker could "sit six out of eight hours during the day, standing and walking is limited to two hours during the day."  (Id. at 46).  She should not stand or walk for "prolonged periods," or bend over to pick things off the floor.  (Id.).  The worker was also unable to "[do] the same activity with the hands over and over and over."  (Id.).  Such a worker could occasionally lift ten pounds and more frequently lift five pounds.  (Id.).  She could also required an option to change position.  (Id.).  Finally, the workers' frequent problems with pain meant that "she is limited to work activities that are one to two-steps and do not change." (Id.).

The vocational expert concluded that such a worker would fit into a vocational

category of "sedentary duty, unskilled." (Id.).  That job would require a "sit/stand option." (Id.).  She could work as a "video monitor," which had 200 positions in the northeast Pennsylvania area.  (Id.)  The worker could also find a position as a machine tender, with 200 jobs available in the region, and as a telephone receptionist with 400 jobs available.  (Id.).  The expert reported that those jobs would not allow a worker to miss more than one day a month or so.  (Id.).  Missing more than that number of days would be a reason for termination.  (Id. at 47).

**ii. Medical Evidence**

The ALJ had plaintiff's medical records before her.  Plaintiff received treatment from Raj Katara, M.D., a board certified neurologist, on December 1, 2003.  (Id. at 188-90).  After an examination, Dr. Katara found plaintiff's mental status normal, her cranial nerve and motor and sensory functions normal, her coordination and gait normal and her reflexes good.  (Id. at 189).  His examination did not discover any tenderness in plaintiff's cervical spine.  (Id. at 190).  He did find L5-S1 tenderness, though plaintiff could perform a positive straight-leg raising test on her right side at sixty degrees.  (Id.).  She could also flex forward to touch her ankles.  (Id.).  This action caused some pain.  (Id.).  Dr. Katara assessed plaintiff with cervical myofascial pain with a history of C4-C6 herniated nucleus pulposus (HNP), lumbar myofascial pain with possible L5-S1 HNP, and right hip dysfunction.  (Id.).  He recommended an MRI examination of the C-spine and L-spine and right hip to check for the presence of these conditions.  (Id.).

Plaintiff also saw Dr. Katara on December 29, 2003.  (Id. at 182-83).  Katara recorded that plaintiff had a positive ANA test with normal complement levels and a negative HLA-B27 antigen.  (Id. at 182).  An EMG and nerve conduction study of the upper extremities revealed a mild bilateral median nerve compression neuropathy of the wrist, which was worse on the right side, and mild bilateral ulnar distal neuropathy.  (Id.).  An MRI of plaintiff's spine revealed degenerative changes and mild canal stenosis at C5-C6 and C6-C7.  (Id.).  Another MRI, this one of the T-spine, revealed disc herniation at T11-T12, multilevel degenerative facet joint and no evidence of disc herniation.  (Id.).  According to another MRI, plaintiff's hip was normal, though she possibly suffered from an ovarian cyst.  (Id.).  After examining these records, Dr. Katara diagnosed plaintiff with lumbar myofascial pain secondary to degenerative joint disease (DJD) and paresthesias with bilateral carpal tunnel syndrome.  (Id.).  He prescribed physical therapy and wrist splints to treat plaintiff's carpal tunnel complaints and referred her to a rheumatologist.  (Id.).

When Dr. Katar next saw the plaintiff, in January 2005, he noted that she reported she had been diagnosed with irritable bowel syndrome.  (Id. at 178).  Plaintiff had also called Dr. Katara's physician's assistant to complain of increased lower back pain.  (Id.).  He had increased her dosage of a pain killer, and this treatment made her feel much better.  (Id.).  Still, plaintiff continued to complain of lower back pain and an achiness all over her body.  (Id.).  Another doctor had examined plaintiff, diagnosed her with goiter and recommended surgery.  (Id.).  She

11

did not follow this recommendation.  (Id.).  Plaintiff did not complain to Dr. Katara of headaches or bowel or bladder incontinence, but did describe numbness and tingling in her hands.  (Id.).  Dr. Katara's neurological examination was normal.  (Id. at 178-79).  His musculoskeletal examination did find myofascial paraspinal muscle tenderness around L4-L5.  (Id. at 179).  Plaintiff's compliment levels were normal, and an EMG and nerve conduction study of her upper extremity indicated mild bilateral median nerve compression neuropathy.  (Id.).  This condition was worse on the right.  (Id.).

Dr. Katara also found mild bilateral ulnar distal neuropathy.  (Id.).  An MRI of plaintiff's thoracic spine demonstrated disc herniation at T11-T12 with no disc herniation in the lumbar regions.  (Id.).  This examination led to a diagnosis of lumbar myofascial pain with history of T11-T12 disc herniation to rule out worsening of the same versus L5-S1 disc herniation, bilateral carpal tunnel syndrome, arthritis and diffuse achiness to rule out zero negative arthritis and a history of goiter.  (Id.).  Dr. Katara ordered another MRI, prescribed a painkiller and advised a decrease in dosage of plaintiff's Mobic.  (Id.).  The follow-up MRI Dr. Katara ordered revealed an increase in the size of a bulging disc discovered by the previous exam but no new evidence of disc herniation.  (Id. at 489).  The T11-T12 area was "incompletely visible" in the MRI.  (Id.).

Plaintiff saw Dr. Katara again in March 2005.  She complained of pain in her right lower back, her right hip and right leg.  (Id. at 478).  She also complained of

achiness all over her body.  (Id.).  Dr. Katara's neurologic examination was normal and a musculoskeletal examination revealed right side hip pain and right paraspinal tenderness at L5-S1.  (Id.).  He diagnosed plaintiff with lumbar myofascial pain, an L5-S1 disc bulge, right hip pain, diffuse achiness, a history of goiter and arthritis described by a rheumatologist.  (Id. at 479).

Plaintiff received treatment from Dr. Charles L. Ludivico, a rheumatologist, in January 2005.  Plaintiff complained to him of a history of muscle, joint and body pain that had extended for two years.  (Id. at 295).  She had pain in her fingers, wrists, shoulders, knees, neck and side of the hips.  (Id.).  She also reported a tingling sensation over her entire body.  (Id.).  Ten years previously, plaintiff reported, she had been paralyzed for about six months.  (Id.).  Plaintiff did not report any of the "typical symptoms of lupus," like "photosensitive rashes, significant hair loss, Raynaud's, oral ulcers or serositis."  (Id.).  The medicine prescribed to treat plaintiff's pain, Mobic, had led to a fifty percent improvement over the previous eight weeks. (Id.).  Dr. Ludivico diagnosed plaintiff with mild, generalized arthralgias (a mild pain in the joints), no suggestion of  lupus from tests, chronic lumbar degenerative disc disease/cervical disc disease, a fifteen year history of diarrhea, thyroid goiter and a history of heart disease.  (Id. at 296).  A follow-up examination in March 2005 revealed that plaintiff had normal stomach function with some inflammation of the small intestine.  (Id. at 294).  Dr.  Ludivico found plaintiff suffered from tenderpoints in the costochondral region, left lateral elbow and medial aspect of the knees.  (Id.).

13

He found no indication of trouble with plaintiff's neck, paracervial, trapezius, sacroiliac and lateral elbow tenderpoints.  (Id.).  Dr. Ludivico diagnosed plaintiff with generalized arthralgias, chronic diarrhea with probable IBS, and chronic cervical/lumbar degenerative disc disease.  (Id.).

Plaintiff also saw Dr. Rajesh G. Bhagat in December 2004.  Dr. Bhagat is a board-certified allergist-immunologist.  (Id. at 213).   A skin test administered in Dr. Bhagat's office "revealed marked reactivity to dust mites."  (Id. at 214).  Dr. Bhagat diagnosed plaintiff with allergic rhinitis due to dust mites, chronic sinusitis, multi-nodular goiter and possibility of carcinoid syndrome and mastocytosis based on a history of diarrhea, flushing and headaches.  (Id.).   On December 20, 2004, he reported that plaintiff complained of nasal congestion, constant postnasal drip, blocked congested ear and sore throat for . . . four or five years without seasonality." (Id. at 311).  Plaintiff also suffered from nose bleeds every three months that were associated with an upper respiratory infection that required antibiotics.  (Id.).  She complained to Dr. Bhagat of stomach pain and diarrhea accompanied by bloating. (Id.).  Dr. Bhagat saw plaintiff for a follow-up visit on January 10, 2005.  He reported that plaintiff's problems with allegeric rhinits due to dust mites and vasomotor difficulties continued, despite her use of Zyrtec D.  (Id. at 211).  Facial flushing that he noticed in plaintiff's previous visit, however, had been eliminated due to the use of Lotronex and Hexosamine.  (Id.).  She had diarrhea.  (Id.).  Nasal congestion continued, but neither headaches or sinus pressure were present.  (Id.).  Dr. Bhagat

14

recommended "[a] program of nasal irrigation followed by Flonase" to improve postnasal drip, along with other medications.  (Id.).

Plaintiff saw gastroenterologist Dr. Charles F.M. Cohan for treatment of bowel complaints in January 2005. (Id. at 259-60).  Dr. Cohan diagnosed plaintiff with IBS. (Id. at 260).  This condition was characterized with predominant diarrhea, but was improving.  (Id.).  She also suffered from lower abdominal pain, which Levsin kept stable.  (Id.).  Nexium kept her gastroesophageal reflux disease (GRD) similarly stable.  (Id.).  Dr. Cohan also found that plaintiff suffered from dysphagia and odynophagia to both solids and liquids.  (Id.).  A February 2005 enteroscopy did not reveal any abnormalities; neither did a colonscopy in November 2005.  (Id. at 239-40, 507-508).

Dr. Natale Falanga treated plaintiff for upper respiratory infections (Id. at 225-37, 246).  On October 7, 2003, plaintiff saw Dr. Falanga, "complaining of a sore throat, clogged sinuses and a burning feeling in her shoulders."  (Id. at 232).  At her visit on January 16, 2004, plaintiff reported that she had been diagnosed with bilateral carpal tunnel syndrome and lumbar myofascial pain secondary to degenerate joint disease.  (Id. at 230).  Dr. Falanga assessed plaintiff with lupus. (Id.).  An examination on February 3, 2004 resulted in the same assessment.  (Id.). Plaintiff continued to complain of symptoms of lupus at subsequent visits.  (Id. at 227-29).  On August 3, 2004, Dr. Falanga reported that a recent test had not confirmed the presence of lupus.  (Id. at 227).  Dr. Falanga noted that "I really don't

think she has lupus." (Id.).  In June 2005 plaintiff saw Dr. Falanga again.  (Id.).

Falanga diagnosed her with an upper respiratory infection with bronchospasm,

asthma/reactive airways disease, multiple joint arthralgias with a low ANA, allergies

and asthma and reactive airways disease.  (Id. at 496, 498, 500).

Finally, a Disability Determination Service (DDS) physician who reviewed

plaintiff's medical records completed a Residual Functional Capacity (RFC)

assessment on February 29, 2004.  (Id. at 80-88).  This physician diagnosed plaintiff

with cervical myofascial pain with a history of HNP.  (Id. at 80).  The doctor

concluded that plaintiff occasionally could lift and/or carry fifty pounds, frequently lift

and/or carry twenty-five pounds and stand and/or walk and sit with normal breaks for

six hours in an eight-hour workday.  (Id. at 81).  Plaintiff had no limits in posture,

manipulation, vision, communication and environment.  (Id. at 82).  The physician

indicated that plaintiff had "described daily activities that are significantly limited."

(Id. at 86).  Plaintiff's pain persisted, despite treatment, and "impacts on her ability to

perform work related activities."  (Id.).  Still, the plaintiff, the doctor concluded, was

only partly credible.  (Id.).  The doctor did not have a statement from a treating or

examining physician on plaintiff's RFC to use in completing this statement.  (Id. at

84).

### iii.  The ALJ's Decision

On December 20, 2005, ALJ Ritteman issued her decision on plaintiff's

application for benefits.  (Id. at 12-19).  The ALJ concluded that plaintiff was not

disabled within the meaning of the Social Security Act.  (Id. at 12).  The ALJ noted

that plaintiff contended that her disability began in 1993, but that "the relevant

medical record before the [judge] essentially begins in 2003, the year before she

filed her SSI."  (Id. at 13).  Since SSI applications are paid based on a patient's

condition after the filing of the claim, older records were unnecessary to ALJ

Ritteman's determination.  (Id.).  The ALJ listed the conditions of which plaintiff

complained, noting that they were "not definitively diagnosed."  (Id.).  Nevertheless,

the ALJ concluded that "[t]he impairments will be considered to be severe in

combination for the purpose of the sequential evaluation."  (Id.).  The ALJ evaluated

the medical evidence and determined that "the claimant has a constellation of

impairments; to wit chronic low-grade pain described as parethesias or generalized

mild arthralgias in the record, GERD [gastroesophegeal reflux disease], and irritable

bowel syndrome."  (Id. at 15).  That combination of ailments the ALJ found to be

severe, but not severe enough to make the plaintiff disabled according to Social

Security regulations.  (Id.).

The ALJ found that plaintiff suffered other ailments as well, including

nonsevere sinusitus and carpal tunnel syndrome.  (Id.).  She noted that plaintiff had

not sought surgery or physical therapy for her carpal tunnel syndrome, and had "not

even purchased wrist splints to wear, a minor investment." (Id. at 15-16).  Though

plaintiff complained of chronic back, shoulder, joint and knee pain, the ALJ

concluded that "the record does not document the objective findings and the

17

limitations in walking or upper extremity use" necessary to constitute a finding of disability.  (Id. at 15).  Similarly, though plaintiff had been prescribed medication for her GERD, she had no record of abdominal pain and "no medical documentation of frequent problems with diarrhea."  (Id. at 16).  She had not described any problems with incontinence, and told a doctor that her problems occurred only once or twice per month.  (Id.).  Accordingly, plaintiff's complaints about her digestive system did not lead the ALJ to a finding of disability.  (Id.).

The ALJ also noted that plaintiff had not consistently sought treatment for her conditions.  (Id.).  She lacked a regular doctor beyond her obstetrician, and did not follow up suggested treatments such as physical therapy, thyroid surgery, EMG testing and pain management.  (Id.).  When plaintiff saw a new physician, she tended "to describe the other potential diagnoses" considered by other specialists as "an enhancement of her condition."  (Id.).  In addition, plaintiff's problems were not consistently bad, but appeared to "wax and wane."  (Id.).  Indeed, plaintiff did not appear to suffer from chronic pain, as she had waited more than year to see a physician for follow-up after visiting Dr. Katara.  (Id.).  Plaintiff also did not suffer from severe sinus problems which would limit her ability to work.  This assessment of plaintiff's physical condition led the ALJ to conclude that plaintiff had a residual functional capacity of "a range of sedentary work."  (Id.).  The ALJ therefore limited plaintiff's capacity to "sit six out of eight hours, stand and walk two out of eight hours, lift 10 lbs occasionally, five pounds frequently, to perform no bending or extensive

reaching, to have a sit/stand option, and to be limited to one to two step jobs."[1] (Id. at 17).

The ALJ found plaintiff's testimony not credible. She noted that plaintiff had sought only limited treatment and had not followed up on doctors' advice "that would help in diagnosis and in improving her alleged symptoms." (Id.). Though plaintiff did not offer the specialists she consulted "inaccurate" medical histories, she did "tend to suggest that other doctors are also treating complex medical problems." (Id.). Though the ALJ insisted she was sympathetic to plaintiff's claim that she lacked adequate insurance coverage for the treatment she needed, she still found that plaintiff's "failure to follow-up suggestions that would improve her status such as thyroid surgery, physical therapy or pain management undermines her credibility." (Id.). The ALJ also did not take plaintiff's lack of a significant work history as evidence of her inability to work, since "any woman with an unskilled work background and a number of young children would find it difficult to maintain work outside the home except in dire necessity." (Id.).

The ALJ then moved to a determination of whether, considering plaintiff's work history and her physical condition, plaintiff could find relevant employment. Plaintiff, the ALJ found, did not have any past relevant work. (Id.). The burden then shifted

---

[1]The ALJ noted that "[a]t the first hearing the claimant's testimony of her medical problems and activities created the picture of an invalid who can do practically nothing during the day, but sit on a couch. Yet she has five children, and it is unlikely that she does not have many demands upon her time. No doctor considers her to be disabled, and no physician has limited her in any activities." (R. at 16).

to the Social Security Administration to demonstrate that jobs existed in the national economy that plaintiff could perform, "consistent with her functional capacity, age, education and work experience." (Id.).  The ALJ concluded that plaintiff, with a high school education and no skills which could be transferred to a new position, since her "past relevant work has not been performed during the relevant period of time." (Id.).  Though the ALJ concluded that plaintiff's "additional exertional and/or non-exertional limitations" meant that she could not perform a full range of sedentary work, she concluded that jobs were available in significant numbers that plaintiff could perform.  (Id. at 18).  Using a vocational expert to compare the plaintiff's capacity with available jobs, the ALJ found that plaintiff could be employed as a video monitor, machine tender and telephone receptionist.  (Id.).  Since all of these jobs "exist in proportionately larger numbers in the state and local economies," the ALJ concluded that plaintiff was not eligible for benefits.  (Id.).

Plaintiff filed a request for review of this decision with the Social Security Appeals Council on December 23, 2005.  (Id. at 7-8).  The Appeals Council denied the plaintiff's petition (Id. at 4-6).  Plaintiff then filed the instant action (Doc. 1).  The plaintiff and the Commissioner filed briefs before Magistrate Judge Thomas M. Blewitt.  Magistrate Judge Blewitt issued a report and recommendation on July 19, 2007.  (See Doc. 10).  In that document, the magistrate judge rejected all of plaintiff's grounds for challenging the ALJ's opinion.  He found that the ALJ did not err in accepting Dr. Besen's medical opinion.  (Id. at 13-14).  Dr. Besen's testimony was

little noted in the ALJ's decision, and the plaintiff had not taken advantage of the

opportunity provided her by the ALJ to supplement the record with other medical

evidence.  (Id. at 14).  The Magistrate Judge also determined the the ALJ correctly

found that plaintiff had the capacity to perform sedentary work.  (Id. at 15-16).  The

ALJ, Magistrate Judge Blewitt found, had adequately considered the evidence in the

record in making this finding.  (Id. at 16).  Magistrate Judge Blewitt also found that

the ALJ's determination that plaintiff was not entirely credible was supported by the

record.  (Id. at 17).  He agreed with the ALJ that plaintiff's subjective complaints of

pain were not supported by the medical evidence.  (Id. at 17).

**Jurisdiction**

We have jurisdiction over the instant action pursuant to 42 U.S.C. § 405 (g).[2]

**Standard of Review**

In disposing of objections to a magistrate judge's report and recommendation,

the district court must make a *de novo* determination of those portions of the report

to which objections are made.  28 U.S.C. § 636 (b)(1)(C); see also Henderson v.

Carlson, 812 F.2d 874, 877 (3d Cir. 1987).  This court may accept, reject, or modify,

in whole or in part, the findings or recommendations made by the magistrate judge.

---

[2]"Any individual, after any final decision of the Commissioner of Social Security
made after a hearing to which he was a party, irrespective of the amount in controversy,
may obtain a review of such decision by a civil action commenced within sixty days after
the mailing to him of notice of such decision or within such further time as the
Commissioner of Social Security may allow.  Such action shall be brought in the district
court of the United States for the judicial district in which the plaintiff resides, or has his
principal place of business."  42 U.S.C. § 405(g).

The district court may also receive further evidence or recommit the matter to the magistrate judge with instructions.  Id.

When reviewing the denial of disability benefits, we must determine whether the denial is supported by substantial evidence.  Brown v. Bowen, 845 F.2d 1211, 1213 (3d Cir. 1988); Mason v. Shalala, 994 F.2d 1058 (3d Cir. 1993).  Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  Richardson v. Perales, 402 U.S. 389, 401 (1971).

The Social Security Act defines "disability" in terms of the effect a physical or mental impairment has on a person's ability to perform in the workplace.  In order to receive disability benefits, a claimant must establish that he is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A).  The Act further provides that a person must "not only [be] unable to do this previous work but [must be unable], considering his age, education, and work experience, [to] engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job exists for him, or whether he would be hired if he applied for work."  42 U.S.C. § 423(d)(2)(A); Heckler v. Campbell, 461 U.S. 458, 459-60 (1983).

In analyzing disability claims, the Commissioner employs a five-step

sequential evaluation.  20 C.F.R. § 416.920.  The initial three steps are as follows: 1) whether the applicant is engaged in substantial gainful activity; 2) whether the applicant has a severe impairment; 3) whether the applicant's impairment meets or equals an impairment listed by the Secretary of Health and Human Services as creating a presumption of disability.   If claimant's impairment does not meet requirement 3, the claimant must demonstrate 4) that the impairment prevents him from doing past relevant work. See 20 C.F.R. §§ 404.1520, 416.920.  If the applicant establishes steps one through four, then the burden is on the Commissioner to demonstrate the final step:  5) that jobs exist in the national economy that the claimant can perform.  Jesurum v. Secretary of the U.S. Dept. of Health and Human Services, 48 F. 3d 114, 117 (3d Cir. 1995).

**Discussion**

Plaintiff raises four objections to the magistrate judge's report and recommendation.  We will discuss each in turn.

**i.  The Magistrate Judge Should Have Rejected the Testimony of Dr.  Lee Besen as Not Supported by the Medical Record**

Plaintiff argues that Dr. Lee Besen's opinion, which concluded that plaintiff did not suffer from a debilitating condition and that the limitations to which she testified were not supported by the medical record, should not have been accepted by the ALJ.  She contends that Dr. Besen "testified in an unprofessional manner" by "curtly dismissing the ailments Claimant claims she suffers from" and which her treating

physicians had diagnosed.  Though Dr. Besen's testimony was only "minimally referred to by the Administrative Law Judge," the mere existence of such testimony "taints the decision such that the matter should be remanded."  (Doc. 10 at 1).  In her brief before the magistrate judge, plaintiff also contends that "the crux of Dr. Besen's testimony was that Claimant had not been diagnosed by her rheumatologist, and that Claimant demonstrated no objective indicia for any of her symptoms."  (Plaintiff's Brief (Doc. 8) at 12-13).

The record indicates that the ALJ used Dr. Besen's testimony to support her finding that plaintiff's "medical record did not establish any firm diagnoses although her problems appeared to be rheumatological in nature."  (R. at 16).  According to the ALJ, Besen's testimony established that plaintiff did not suffer from lupus or fibromyalgia, nor did the medical evidence support plaintiff's orthopedic complaints. (Id.).

During cross-examination, plaintiff's attorney asked Dr. Besen to examine the records of MRI exams.  (Id. at 38).  Dr. Besen agreed that plaintiff's January 17, 2005 MRI indicated "a mild to moderate degenerative disk and facet change at L5-S1" and a "mild to moderate bilateral foramina stenosis at the L5-S1 level."  (Id.).  Dr. Besen disagreed, however, that these findings indicated a "significant pathology at that level of the lumbar spine."  (Id.).  He did not "consider bulging with mild to moderate foramina posted as a major pathology."  (Id.).  Besen also pointed out that he did not doubt that "some kind of pathology" existed in plaintiff's lower extremities,

the fact that no doctor had ever performed an EMG of the lower extremities made diagnosing plaintiff's condition impossible.  (Id. at 39). After examining another MRI, Dr. Besen agreed that plaintiff had been diagnosed with "intermittent myofascial pain syndrome," but disputed the significance of that diagnosis.  (Id. at 41).  He indicated that such a diagnosis meant that the rheumatologist had found pain, but could not provide a concrete source of that pain.  (Id. at 42).  Finally, Besen found that plaintiff suffered from chronic cervical/lumbar degenerative disk disease and irritable bowel syndrome.  (Id.).

Dr. Besen's acknowledged many of plaintiff's subjective complaints of pain, and reported accurately the contents of the medical records he examined.  Dr. Besen's assessment that many Americans suffer from back pain and irritable bowel syndrome are not evidence, as plaintiff claims, of unprofessional behavior and "unethical bias." Providing a medical assessment as to the severity of plaintiff's condition was the job assigned Dr. Besen.  Given the lack of medical evidence on plaintiff's limitations, Dr. Besen had to assess the severity of her condition in relation to the rest of the population, and he merely noted the widespread nature of those conditions to support a view that plaintiff could work despite her illness.  Describing the prevalence of plaintiff's condition in the rest of the population is also professional behavior of the sort Dr. Besen was expected to engage in.  Finally, as the plaintiff acknowledges, the ALJ herself admitted that she used Dr. Besen's opinion in only a limited sense.  Therefore, even if we were to adopt plaintiff's objection on this point,

our evaluation of the larger case would not change.  In any case, we find that the

ALJ did not mis-use the medical information of Dr. Besen, and will dismiss the

objection on this point.

### ii.  The Magistrate Judge Erred in Finding that the Plaintiff Had the Residual Functional Capacity for Sedentary Work

The magistrate judge determined that the ALJ correctly concluded that plaintiff

had the residual functional capacity to complete sedentary work.  He noted that the

ALJ based her determinations on the one RFC assessment before her, that of the

DDS physician.  In addition, the magistrate judge found that the medical record did

not contain evidence from plaintiff's physicians that supported her claims of disability

or that plaintiff's symptoms would restrict her from working.  The magistrate judge

therefore concluded that "the ALJ properly considered the medical evidence and

properly determined that Plaintiff is capable of performing sedentary work."  (Doc. 10

at 16).  The plaintiff objects to these findings, contending that the medical evidence

supported the plaintiff's subjective claims and that the ALJ misstated the content of

that medical evidence.

We find that there was substantial evidence for the ALJ to make these

determinations.  Our job in evaluating this decision is to determine whether

"substantial evidence" exists to support the magistrate judge's determination.  Brown

v. Bowen, 845 F.2d at 1213 (3d Cir. 1988).  Substantial  evidence is "such relevant

evidence as a reasonable mind might accept as adequate to support a conclusion."

Richardson v. Perales, 402 U.S. 389, 401 (1971).  The record is replete with

complaints from the plaintiff to her doctors about pain in her back and extremities.

There are also reports of tests and examinations that support plaintiff's claims of

back problems, allergy and sinus issues, and bowel problems.  At the same time,

however, the record does not contain assessments of plaintiff's residual functional

capacity from these doctors, nor are there indications from plaintiff's treating

physicians that her physical problems should limit her activities in particular ways.

Plaintiff points to areas where she claims the ALJ lacked substantial evidence

for her conclusions.  While plaintiff agrees that the ALJ "did thoroughly discuss and

review the evidence," she argues that the ALJ "reached several conclusions not

supported by the medical record."  (Doc. 8 at 14).  She disputes the magistrate

judge's conclusion that "no etiology for [plaintiff's] abdonminal pain has been found

and there is no medical documentation of frequent problems with diarrhea."  (Id.).

Plaintiff points to Dr. Cohan's conclusion that plaintiff had "'a classic case of IBS'"

and a diary plaintiff kept that demonstrated "difficulty with her IBS symptoms."[3]

We find that the ALJ had substantial medical evidence to reach these

---

[3]We note that acknowledging that plaintiff has IBS does not necessarily discount the ALJ's conclusion that "no etiology for plaintiff's abdominal pain has been found," since "[n]o one knows exactly what causes irritable bowel syndrome . . . Some researchers believe IBS is caused by changes in the nerves that control sensation or muscle contractions in the bowel.  People with IBS may have a heightened sensitivity to or stretching of the bowel with gas leading to pain or bloating.  Others believe the central nervous system may affect the colon.  And because women are twice as likely to have IBS, researchers believe that hormonal changes also play a role.  Also, many women find that signs and symptoms are worse during or around their menstrual periods."  *Irritable bowel syndrome*, at www.mayoclinic.com/health/irritable-bowel-syndrome/DS00106/DSECTION=3.

conclusions about plaintiff's stomach condition.  First, we note that the ALJ actually

agreed with Dr. Cohan's assessment that plaintiff suffered from irritable bowel

syndrome.  Among the impairments listed by the ALJ in her decision was "irritable

bowel syndrome."  (R. at 15).  Plaintiff's diary of her IBS complaints also does not

mean that the ALJ's conclusion that plaintiff did not offer documentation of frequent

problems with diarrhea is not supported by substantial evidence.  The diary covers

less than one month, and even in that month plaintiff did not suffer daily incidents of

diarrhea; plaintiff instead reports many "stomach attacks" and "cramps," diarrhea on

4-6 days, and aches and pains over her body.  (Id. at 285-89).   Medical records

from Dr. Cohan indicate that plaintiff's diarrhea had improved with medication.  (Id. at

260).  Tests of plaintiff's colon and digestive system also revealed that plaintiff did

not suffer from any abnormalities in those areas.  (Id. at 239-40; 507-508).  Plaintiff's

testimony before the ALJ likewise revealed that her stomach problems and diarrhea

had been relieved somewhat by medication.  (Id. at 63).   The magistrate judge

therefore had substantial evidence to conclude that the diarrhea brought about by

plaintiff's irritable bowel syndrome did not produce documentation of frequent

problems with diarrhea.[4]

Our determination that substantial evidence existed for the ALJ's opinion that

---

[4]Plaintiff raises other objections to the ALJ's findings in relation to the medical
evidence as well.  These objections are to the conclusions that the ALJ drew from
the evidence, rather than with the sufficiency of the evidence that led to those
conclusions.  They are not, therefore, objections that we need address.

plaintiff was not disabled is supported by the fact that the medical evidence does not

contain any statements from treating physicians recommending any particular

limitations on the plaintiff's activities.  None of plaintiff's doctors completed

assessments of her capacity, despite invitations from the ALJ through the plaintiff's

lawyer to do so.   Even if the plaintiff were to have found that the medical evidence

supported all of the plaintiff's listed complaints, she could not have used that

evidence to make any conclusions about what plaintiff could and could not do.

Absent any contrary assessments of plaintiff's capacities, the statements by state

agency evaluators must be considered substantial evidence that supports the ALJ's

assessment.  We will therefore dismiss the objection on this point as well.

### iii.  The Magistrate Judge Erred in Finding that the ALJ Correctly Concluded that Plaintiff's Testimony About Her Symptoms Was Not Credible

Plaintiff challenges the ALJ's finding that the ALJ correctly concluded that

plaintiff's subjective complaints of pain were not entirely credible.  These complaints,

the magistrate judge found, were contradicted both by medical evidence and

plaintiff's own testimony about her daily activities.  Evidence that contradicted

plaintiff's complaints of total disability included her ability to walk down the street and

around the mall without stopping; her ability to lift and carry a gallon of milk with

minimal pain; plaintiff's ability to sit for fifteen to thirty minutes at a time; and her

ability to care for five children at home.  The magistrate judge found it significant that

plaintiff could prepare breakfast for her children, send the older ones to school and

care for the youngest child at home.  Though limited in her ability to vacuum, scrub, cook and walk the dogs, plaintiff admitted that she could do laundry, change bed linens and (with assistance) go grocery shopping.  She also cooked most meals.  Accordingly, the magistrate judge concluded, "The ALJ did not ignore the allegations of Plaintiff's pain.  Rather, she acknowledged Plaintiff's testimony regarding the pain.  She then found the Plaintiff not wholly credible for the reasons previously stated." (Doc. 10 at 18).

In general, a reviewing court "defer[s] to an ALJ's credibility determination because he or she has the opportunity to assess a witness's demeanor."  Reefer v. Barnhart, 326 F.3d 376, 380 (3d Cir. 2003).  "When making credibility findings, the ALJ must indicate which evidence he rejects and which he relies upon as the basis for his findings."  Salles v. Comm'r of Soc. Sec., 229 Fed. Appx. 140, 146 (3d Cir. 2007) (citing Schaudeck v. Comm'r of Soc. Sec., 181 F. 3d 429, 433 (3d Cir. 1999)). An ALJ may reject a limitation asserted by a claimant for which objective medical support does not exist, but "should not reject a claimed symptom that is related to an impairment and is consistent with the medical record simply because there is no medical evidence to support it."  Rutherford v. Barnhart, 399 F.3d 546, 554 (3d Cir. 2005).  The ALJ must afford "subjective complaints" of restrictions "'serious consideration'," and offer "specific findings of fact, including credibility" to describe a claimants' capacities. Burns v. Barnhart, 312 F.3d 113, 129 (3d Cir. 2002) (quoting Mason v. Shalala, 994 F.2d 1058, 1067 (3d Cir. 1993).

The ALJ did not reject the findings of plaintiff's doctors in concluding that her claims of restrictions were not credible.  Indeed, the ALJ adopted many of the treating physicians' findings in her conclusions about the plaintiff's medical condition.  The magistrate judge also did not reject any doctor's recommendations when she made her conclusions about plaintiff's RFC; the plaintiff's treating physicians offered no such assessments.  The ALJ simply did not adopt all of plaintiff's claimed limitations on her physical activity.[5]   In finding the plaintiff less than credible on these limitations, the ALJ listed a number of reasons for discounting plaintiff's complaints.  First, plaintiff had not sought consistent treatment for the ailments about which she complained, and had not sought treatment suggested to her by doctors that could have eased her discomfort.  Her failure to pursue follow-up care for some conditions, though partly explained by a lack of adequate insurance coverage, also limited her credibility for the ALJ.  The fact that plaintiff did not have a significant work history also did not support her claims of limitations; many woman who were parents of small children and lacking in skilled work experience would likewise find working outside the home difficult, regardless of disability.  We find this explanation sufficient to support the ALJ's assessment that plaintiff's claims had only limited credibility.  All of the ALJ's reasons are supported by specific findings of fact from the record and are adequately explained.  Accordingly, we will dismiss this objection as

---

[5]We note that the ALJ only had one RFC assessment in front of her when she made her decision, and she offered more restrictions on plaintiff's activity than the assessor did.  The ALJ did, therefore, give some weight to the plaintiff's complaints.

well.

### iv.  The Magistrate Judge Erred in Finding that the ALJ was Correct in Supplementing the Record

The plaintiff complains that the magistrate judge improperly concluded that "the medical record needed to be augmented by further, non existent records of the treating Rheumatologist."  (Doc. 12 at ¶ 4).  Plaintiff contends that the medical reports already in the record from that rheumatologist, along with other medical records, demonstrated that plaintiff "could not return to any work," including sedentary work.  (Id.).

The report and recommendation does not make a specific finding on this issue.  Magistrate Judge Blewitt does note, however, that the ALJ gave plaintiff a chance to supplement the record with additional information from Dr. Ludivico "regarding the plaintiff's limitations."  (Report and Recommendation (Doc. 10) at 14).  None of plaintiff's doctors had completed an RFC and submitted it for the record, and plaintiff did not accept the ALJ's invitation to supplement the record with such information.

We will dismiss this objection.  None of the medical evidence provided by the plaintiff's doctors and available at the first hearing contained an assessment of the plaintiff's RFC or even a generalized statement of activities which plaintiff could not perform.  Still, plaintiff claimed considerable limitations on her activities.  At plaintiff's second hearing, the ALJ noted to plaintiff's attorney that he had "Dr. Ludivico

available to you as a treating source."  She suggested to the attorney that he

"contact him and see if he can give you some more specifics as to what he sees."

(R. at 42).  The ALJ also offered to contact Dr. Ludivico herself and "direct some

questions to him," questions over which plaintiff's attorney would "have some input."

(Id. at 42-43).  Plaintiff's attorney did not take this opportunity, despite the fact that

the ALJ pointed out that "I have to rely on the medical expert I have, you know, in the

absence of the treating doctor telling me something . . . and this is a troublesome

record.  A very troublesome record."  (Id. at 43).

    At this supplemental hearing, then, the ALJ informed plaintiff's lawyers that the

record was inadequate for her to conclude that plaintiff was disabled, or to establish

extensive limitations without more information from plaintiff's treating physician.  Our

review of the record indicates that the ALJ was reasonable in her assessment of the

evidence.  Indeed, without supplements to the record, only one assessment of

plaintiff's work capacity existed, from a state physician who concluded that plaintiff

was capable of returning to work with few restrictions on her activity.  This

assessment actually contained fewer limitations than the ALJ eventually applied.  In

short, the ALJ did not rule against plaintiff at the end of the second hearing, but

instead provided her with an opportunity to supplement a record that the ALJ had

concluded did not support her claims.  Asking for additional evidence in such a

setting is not an error on the ALJ's part, but instead an attempt at fairness. Indeed,

"ALJs have a duty to develop a full and fair record in social security cases." Ventura

v. Shalala, 55 F.3d 900, 902 (3d Cir. 1995).  "An ALJ must secure relevant

information regarding a claimant's entitlement to social security benefits." Id.  The

ALJ did that here, and we find no error in attempting to supplement the record with

material that would support plaintiff's claims.   We will accordingly dismiss this

objection.

**Conclusion**

For the foregoing reasons, we will dismiss the plaintiff's objections in this case

and deny the plaintiff's appeal of the ALJ's decision.  An appropriate order follows.

# IN THE UNITED STATES DISTRICT COURT
# FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

LORI E. LONG,                          :        No. 3:06cv578
                    Plaintiff          :
                                       :        (Judge Munley)
                                       :
          v.                           :
                                       :
MICHAEL J. ASTRUE, Commissioner        :
of Social Security,                    :
                    Defendant          :
::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::

## ORDER

   **AND NOW**, to wit, this 12th day of October 2007, the plaintiff's objections

(Doc. 12) to Magistrate Judge Thomas M. Blewitt's report and recommendation

(Doc. 10) are hereby **DISMISSED**.  The report and recommendation is hereby

**ADOPTED**, the plaintiff's appeal is **DENIED** and the Clerk of Court is directed to

**CLOSE** the case.

                                       By the Court:


                                       s/ James M. Munley
                                       **Judge James M. Munley**
                                       **United States District Court**